# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

KENNETH KENNEDY,

                Petitioner,           :     Case No. 1:15-cv-684

    - vs -                          District Judge Sandra S. Beckwith
                                    Magistrate Judge Michael R. Merz

JOHN COLEMAN, Warden,
 Toledo Correctional Institution,

                          :
              Respondent.

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case under 28 U.S.C. § 2254. The Petition was filed in the Northern District of Ohio and transferred to this Court by Magistrate Judge Kathleen Burke after the Return of Writ was filed (Transfer Order, ECF No. 11). After transfer, the case was assigned to Magistrate Judge Karen Litkovitz who granted Petitioner permission to file an Amended Traverse (Order, ECF No. 15). Earlier this month, the case was transferred to the undersigned as part of an effort to balance the workloads of Magistrate Judges in the Western Division (ECF No. 21). The case is ripe for decision on the Petition (ECF No. 1), the Return of Writ and State Court Record (ECF Nos. 7, 8), and the Amended Traverse (ECF No. 20).

Petitioner pleads the following grounds for relief:

> **Ground One:** The trial court erred as a matter of law by allowing the state to introduce hearsay statements which violated appellant's right to a fair trial and his right to confront his accusers in violation of Federal Law and his Constitutional rights.

1

**Supporting Facts:** Because "hearsay" under Rules of Evidence, Rule 80l(C), is rarely admissible at trial to prove or disprove facts relevant to material issues in the case, the Petitioner would argue that the trial court impermissably [sic] allowed Officer Schultz to testify as to what Mr. Stuckey said about who shot him, that his statement was not a dying declaration"· under the exception to the hearsay rule codified in Evid.R. 804(8)(2) because he his statements were not made under a "sense of impending death", and therefore should not have been permitted under the law.

**Ground Two:** The trial court erred as a matter of law by overruling appellant's motion for relief from prejudicial joinder, denying the Petitioner of a fair trial.

**Supporting Facts:** The Petitioner was charged with two or more offenses in his indictment; however, they were not all of the same or similar character, based upon the same act or transaction, based on two or more acts connected together or constituting parts of a common scheme or plan or part of a course of criminal conduct. This violates Ohio Crim.R. 8(A). Also, assuming one of these factors do apply, if it appears that a defendant or the State will be prejudiced by such joinder, the court shall order separate trials or provide such other relief as justice requires, pursuant to Crim.R. 14.

**Ground Three:** The trial court erred as a matter of law be [sic] permitting other acts testimony into evidence thus prejudicing appellant's right to a fair trial.

**Supporting Facts:** In this case, Mr. Johnson, a witness for the State, was permitted to testify that Petitioner bragged to him about being a serial killer and having "bodies on his belt." This testimony was prejudicial and not relevant to prove Appellant's guilt. Therefore, because Ohio Evidence Rule 404(B) does not permit evidence of other crimes, wrongs or acts to be admissible to prove character of the person in order to show that he acted in conformity therewith the Petitioner's rights to a fair trial were violated.

**Ground Four:** The evidence was insufficient as a matter of law to sustain appellant's convictions.

**Supporting Facts:** The Petitioner asserts that the convictions were not based on sufficient evidence as a matter of law, and any reasonable trier of fact could not have found him guilty beyond a reasonable doubt. The State, in this matter, failed to prove beyond a reasonable doubt that he committed these offenses. There was no

> physical evidence linking him to any of the scenes nor was there any eyewitness testimony. The only evidence presented by the State to implicate Mr. Kennedy as the shooter was testimony of five convicted felons, several of whom were serving time for violent offenses, and all of whom had something to gain by their testimony. The testimony was all based on alleged statements made by the Petitioner to these witnesses. There was also insufficient evidence to prove beyond a reasonable doubt that Mr. Kennedy purposely caused the death of the victims.

(Petition, ECF No. 1.)


**Procedural History**


Mr. Kennedy was indicted by a Hamilton County grand jury on fifteen counts, including two counts of aggravated murder, four counts of murder, four counts of felonious assault, four counts of having weapons under disability and one count of aggravated robbery. All counts had firearm specifications except the four counts of having weapons under disability. Because the offenses arose from separate incidents, Kennedy sought their severance, which was denied. He was found guilty on all counts and specifications and sentenced to two terms of life imprisonment without the possibility of parole.

With the assistance of new counsel, Kennedy appealed to the First District Court of Appeals raising five assignments of error:

1. The trial court erred as a matter of law by overruling appellant's motion for relief from prejudicial joinder.

2. The trial court erred as a matter of law by allowing the state to introduce hearsay statements which violated appellant's right to fair trial.

3. The trial court erred as a matter of law by permitting other acts testimony into evidence thus prejudicing appellant's right to a fair trial.

4. The evidence was insufficient as a matter of law and/or against the manifest weight of the evidence to sustain appellant's convictions.

5. The trial court erred as a matter of law by improperly sentencing appellant.

The First District overruled the assignments of error except for a remand for proper findings for consecutive sentences, an issue not before this Court. *State v. Kennedy*, 2013-Ohio-4221, 998 N.E.2d 1189, 2013 Ohio App. LEXIS 4431 (1st Dist. Sep 27, 2013), appellate jurisdiction declined, 138 Ohio St. 3d 1414 (2014). In its opinion, the First District found the following background facts from the evidence presented at trial:

### A. Gambling-Apartment Shootings

[*P3] In the early morning of March 27, 2006, Janie Matthews, known as "Bedrock," Rodney Turnbow, Derrick Dumas, and others were playing cards for money in Matthews's second-floor apartment in the Walnut Hills area of Cincinnati. According to Dumas, Jaydee Thompson had participated in the game earlier in the night.

[*P4] About 30 minutes after Thompson left, at least two armed and masked male assailants entered Matthews's apartment building. One of the assailants knocked on Matthews's door. After Matthews had partially opened the door, he shot her with a 9-mm semiautomatic weapon and forced his way in. He then fired at Turnbow with the same gun, striking him in the head, and robbed everyone inside the apartment, including Dumas.

[*P5] Later, as the assailants fled down the stairs of the apartment building, they encountered Deandre Thomas. Thomas recognized Thompson as one of the assailants, and Thompson shot Thomas in the face.

[*P6] When the police arrived, they found Matthews just inside the apartment, near the door, and Turnbow nearby. Both died as a result of their gunshot wounds. The police found Thomas on stairs

4

of the apartment building. He survived and identified Thompson as the man who had shot him. Ballistic-test results on the cartridges that the police found at the crime scene demonstrated that two firearms had been used. The cartridges found inside Matthews's apartment and just outside of her door had been fired from one firearm, but the cartridges found in the stairwell on the ground floor and on the steps had been fired from another.

[*P7] Several weeks after the shootings, Kennedy told Derrell Anderson about "Bedrock's" shooting, when they were both passengers in the car of man named Jaleel. Anderson and Jaleel had picked up Kennedy from a parking lot in Walnut Hills and were taking him to Burnet Avenue in Avondale because Kennedy said he needed to escape from "guys" in the Walnut Hills neighborhood who were after him because he had killed Matthews. Kennedy explained to Anderson the details of the crime, including that he had shot Matthews as she tried to shut the door on him, that he had taken the gambling money, that he had shot another man inside the apartment, and that "JayDee" had shot someone in the face on the stairs.

[*P8] While in the Hamilton County Justice Center, Kennedy told two inmates, Tobias Johnson, who knew Matthews, and Jermaine Beard, about his role in the gambling-apartment shootings and provided the details of the crime. Johnson testified that Kennedy had told him that Thompson had been gambling at Matthews's apartment, and that Thompson had set up the robbery, because he owed Kennedy a favor for previously turning him onto a "lick." Kennedy said that Matthews had come to the door after he knocked on it, and that he had shot her when she tried to shut it. He also admitted that he had shot Turnbow because he tried to run, and that he had "robbed everybody." Kennedy credited his accomplice Thompson with shooting a man in the face on the stairs as they were leaving.

[*P9] Beard testified that Kennedy had told him that he had pretended to be "JayDee" to enter a gambling apartment, that he had shot the lady who opened the door when she tried to close it on him, and that he had shot a man named "Rodney" and had taken about $1500 from him.

## B. Vine-Street Shootings
[*P10] On June 23, 2006, Dwayne Stuckey was shot on Vine Street in the Over-the-Rhine area of Cincinnati. The shooting began in the street, but ended inside a Cricket Store, which was located next to a Kroger store. Stuckey was shot six times and

eventually died from his wounds. Phillip Simmons, a bystander on the street, was injured by a stray bullet.

[*P11] Officer Shultz, on bike patrol nearby, heard the gunfire and rushed to the scene. He approached Stuckey and asked him who had shot him. After initially declining to answer, Stuckey identified his shooter as "Midnight" and "Midnight from Burnet."

[*P12] Limited video surveillance from the Cricket Store captured the image of the shooter, who appeared to be very dark complected. When questioned by the police about the crime, Kennedy, who was described as very dark complected, acknowledged that his nickname was "Midnight." He also admitted that Stuckey had previously robbed him. Kennedy was arrested in October 2006 on Burnet Avenue. While in the justice center, he told Major Paige that he had chased down and shot Stuckey on Vine Street. Paige also learned from Kennedy that a stray bullet had struck a bystander.

[*P13] Kennedy also admitted to shooting Stuckey to another inmate, Dante Robb. According to Robb, Kennedy explained that because Stuckey had robbed him a few days earlier, when he saw Stuckey leaving a Kroger store, he started after him and shot at him, striking both Stuckey and a bystander. Both Robb and Paige testified at trial that they knew Kennedy as "Midnight."

*State v. Kennedy*, *supra*.

# Analysis

Respondent raises no procedural defense to the Petition, but defends on the merits (Return, ECF No. 7, PageID 39-40).

Respondent argues that the first three grounds for relief raise only state law claims, rather than federal constitutional claims.  Federal habeas corpus is available only to correct federal constitutional violations.  28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1 (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982); *Barclay v. Florida*,

463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Habeas relief may be available where a violation of state law "amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution." *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008), *cert denied*, 129 S. Ct. 1991 (2009). "State law errors may warrant habeas relief if the errors 'rise for some other reason to the level of a denial of rights protected by the United States Constitution.'" *Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010), *quoting Barclay v. Florida*, 463 U.S. 939, 957-58 (1983).

Conversely, when a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton*, 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

**Ground One: Hearsay and Confrontation**

In his First Ground for Relief, Kennedy alleges he was denied a fair trial and the right to confront his accusers by admission of hearsay at trial, to wit, the statement by victim Dwayne Stuckey identifying Kennedy as the person who shot him.

This was Kennedy's second assignment of error on direct appeal and the First District decided it as follows:

### B. Dying Declaration

[*P37] In his second assignment of error, Kennedy contends that the trial court erred by allowing Officer Schultz to testify as to what Stuckey said about who had shot him, in violation of the rules of evidence and in violation of his right, secured by the Sixth Amendment to the United States Constitution, to confront witnesses against him.

[*P38] Before we begin our analysis, we note that our record does not contain Kennedy's written motion for the exclusion of the evidence or the transcript from the evidentiary hearing on that matter. Kennedy orally moved pretrial for the exclusion of Stuckey's statements, claiming that they were inadmissible under Evid.R. 804(B)(2), and that their admission would violate his right of confrontation. He mentioned at that time that he had filed a written motion, but he was apparently relying on the written motion in limine filed in the dismissed case, which the trial court had overruled after an evidentiary hearing upon a determination that the statements were dying declarations. The trial court in this case overruled the oral motion without holding a new evidentiary hearing, based on the parties' summary of the evidence at the prior hearing and their arguments. At that time, the state argued that the court had correctly determined that Stuckey's statements to Officer Schultz were "dying declarations," and that they thus fell under an exception to the hearsay rule. Kennedy did not object to Officer Schultz's testimony at trial.

[*P39] We address Kennedy's claim without deciding whether, under these circumstances, Kennedy waived all but plain error. And we review the assignment of error based on the record before us, which does not contain Kennedy's written motion in limine or the transcript of the evidentiary hearing in the dismissed case.

### 1. Evid.R. 804(B)(2)

[*P40] Evid.R. 804(B)(2) sets forth the hearsay exception for "dying declarations." The rule provides that "a statement made by a declarant, while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death," is not excluded by the

hearsay rule in a prosecution for homicide or in a civil case, if the declarant is unavailable as a witness.

[*P41] To fall under the hearsay exception set forth in Evid.R. 804(B)(2) for dying declarations, the evidence must show that the deceased's statements were made under a sense of impending death that excluded from the mind of the dying person all hope or expectation of recovery. *See, e.g.*, *State v. Ray*, 189 Ohio App.3d 292, 2010-Ohio-2348, 938 N.E.2d 378, ¶ 40 (8th Dist.); *State v. Washington*, 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 21; *State v. Ross*, 7th Dist. Nos. 96-CA-247 and 96-CA-251, 1999 Ohio App. LEXIS 4859 (Oct. 12, 1999), cited in *State v. McGee*, Mahoning Case No. 07-MA-137, 2009-Ohio-6397, ¶ 33.

[*P42] The declarant is not required to state that he believes that he will not survive; rather, the necessary state of mind can be inferred from circumstances at the time of the declaration. *Ross*, *supra*, citing *State v. Kotowicz*, 55 Ohio App. 497, 501, 24 Ohio Law Abs. 464, 9 N.E.2d 1003 (6th Dist.1937), quoting *Shepard v. United States*, 290 U.S. 96, 100, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

[*P43] According to Kennedy, the evidence at trial failed to demonstrate that Stuckey was under a sense of impending death when he made the statements identifying his shooter as "Midnight" and "Midnight from Burnet." The state maintains that the statements were properly admitted under Evid.R. 804(B)(2) as dying declarations. We agree with the state.

[*P44] When Officer Schultz responded to the scene of the Vine-Street shooting, a bloodied Stuckey was laying on the floor of the Cricket Store. Stuckey was conscious, but he was moaning and gasping in pain from receiving six gunshot wounds, including wounds to his left hip, right buttocks, right arm, right calf, left thigh, and torso. This last wound was caused when a bullet entered his back and perforated his lung before exiting out of his chest.

[*P45] At first, Stuckey declined to tell the officer who had shot him. Officer Schultz pressed Stuckey for a statement as he watched Stuckey's physical condition deteriorate and his coloring fade.

[*P46] Officer Schultz asked, "You sure you don't want to tell me? You are laying on the floor, you have hole in your chest and you are turning gray. Maybe you will live and take care of this yourself, but if you are going to die, you can give me the information, tell me who shot you, where the gun is, where he is at." Responding, Stuckey shrugged his shoulders and then said,

"Midnight." When Officer Schultz asked, "Who is Midnight?," Stuckey replied, "Midnight from Burnet."

[**P47**] Stuckey became unconscious shortly afterwards, and paramedics transported him to the hospital, where he later died from "hemorrhagic shock due to hemothorax due to gunshot wound of torso." [Footnote omitted]

[**P48**] Based on the circumstances at the time of the statements, we conclude that Stuckey believed his death was imminent. Stuckey had suffered multiple gunshot wounds, and he was visibly struggling with his vital functions. Moreover, Officer Schultz essentially told Stuckey that he was going to die, and that if Stuckey believed so, then he needed to identify his assailant. Stuckey identified his assailant, demonstrating his belief of impending death.

[**P49**] Kennedy also suggests that Stuckey's statements did not qualify as dying declarations because Stuckey did not pass away immediately. Traditionally, the length of time elapsing between the declaration and death is an element to be considered in whether the statement was made under impending belief of death. *Mattox v. United States*, 146 U.S. 140, 151, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *Ray*, 189 Ohio App.3d 292, 2010-Ohio-2348, 938 N.E.2d 378, at ¶ 42. But "'it is the impression of almost immediate dissolution, and not the rapid succession of death, in point in fact, that renders the testimony admissible.'" *Mattox* at 151, quoting 1 Greenleaf, Evidence 15th Ed. Section 156, 157, 158. "Despair may even be gathered, though the period of survival outruns expectations." *Shepard v. United States*, 290 U.S. 96, 54 S. Ct. 22, 78 L. Ed. 196 (1933).

[**P50**] While Kennedy suggests that Stuckey lived for 36 hours, the medical records unequivocally demonstrate that Stuckey died about 12 hours later. Further, Officer Schultz's testimony shows that Stuckey made his declarations only after determining that he would soon die and would not be able to avenge his killer, a reasonable conclusion under the circumstances, where he had been shot six times and was struggling to live. Stuckey became unconscious shortly after making the statements and died in surgery. Under these facts, we conclude that Stuckey made the declarations under a belief of impending death, even though he died 12 hours later.

[**P51**] Because Stuckey's statements to Officer Schultz identifying his assailant were made under a belief of impending death and

10

were offered in a prosecution for homicide, the statements qualified as dying declarations under Evid.R. 804(B)(2).

[*P52] This case is distinguishable from *State v. Woods*, 47 Ohio App.2d 144, 352 N.E.2d 598 (9th Dist.1972), on which Kennedy relies. In *Woods*, the court held that the record did not support a finding that the victim had sensed his death was impending, and that he had abandoned all hope of recovery, even though the victim had suffered a mortal gunshot wound and was in critical condition at the time of his declaration. Unlike the victim in *Woods*, Stuckey was moaning and gasping in pain and had resisted providing the information about his assailant until he was informed of the severity of his condition. Further, Officer Schultz believed that Stuckey thought he was dying, unlike in *Woods*, where the emergency room surgeon testified that he did not believe that the victim had believed that he would die and that the victim had only complained about leg pain. *Id*. at 146-147. In light of these differences, we are not persuaded that *Woods* requires a different result.

## 2. Confrontation-Clause Analysis

[*P53] Kennedy additionally argues that the admission of Stuckey's statement to Officer Schultz violated his rights under the Confrontation Clause of the Sixth Amendment. The Confrontation Clause prohibits the admission of testimonial statements of a witness who did not testify at trial, unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

[*P54] In *Crawford*, the Supreme Court substantially altered prior case law that had generally permitted the admission of statements that fell within hearsay exceptions based upon unavailability, provided that the statements bore significant indicia of reliability. The *Crawford* court rejected that prior case law as insufficient to protect the right to confrontation set forth in the Sixth Amendment's Confrontation Clause, which incorporated the right of confrontation as it existed "at common law, admitting only those exceptions established at the time of the founding." *Crawford* at 54.

[*P55] The *Crawford* court observed, however, that dying declarations were recognized at the common law as an exception to the right of confrontation. *Id*. at fn. 6.

[*P56] After the Supreme Court's decision in *Crawford*, this court, in *State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, sua sponte reviewed whether statements admitted as dying declarations under the hearsay exception set forth in Evid.R. 804(B)(2), an exception based on the unavailability of the witness, violated the Confrontation Clause and created either preserved or plain error in that case. We stated that *Crawford* did not appear to bar the admission of the challenged statements because they were not testimonial, and the Confrontation Clause is inapplicable to, and does not prohibit the use of, nontestimonial statements. *Id*. at ¶ 75. We also noted that the *Crawford* court had recognized the common-law hearsay exception for dying declarations and had "left unanswered the question whether its analysis applies to testimonial dying declarations." *Id*.

[*P57] We cited *Nix* with approval in *State v. Washington*, 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 33, when rejecting the defendant's claim that the admission of the victim's statements violated his Confrontation Clause rights. We held that the statements, which were admissible under the Evid.R. 804(B)(2) exception for dying declarations, were not testimonial, and that their admission did not violate the Confrontation Clause. See also *State v. Duncan*, 8th Dist Cuyahoga No. 87220, 2006-Ohio-5009, ¶ 24.

[*P58] In this case, neither party has analyzed whether Stuckey's statements were "testimonial" under the relevant precedent, and we refrain from making that determination. Instead, we hold that the admission of a statement that qualified as a dying declaration under the common law, including one that is testimonial, does not conflict with the Sixth Amendment and does not implicate *Crawford*. Further, we hold Stuckey's statements to Officer Schultz qualified as dying declarations under the common law. Thus, the admission of the statements did not violate Kennedy's Confrontation Clause rights, and a determination of whether the statements are testimonial is unnecessary.

[*P59] The Ohio Supreme Court has not addressed whether *Crawford* altered the analysis concerning the admission of dying declarations when challenged as a Confrontation Clause violation. But the court recognized long before *Crawford*, and long before the promulgation of Ohio Evid.R. 804(B)(2), that dying declarations had been recognized at common law as an exception to the constitutional right of confrontation. See *State v. Kindle*, 47

12

Ohio St. 358, 361, 24 N.E. 485 (1890); *Summons v. State*, 5 Ohio St. 325, 342 (1856).

[*P60] And several other state supreme courts have expressly held that *Crawford* does not apply to the admission of a statement recognized as a dying declaration under the common law, even if it is testimonial. *See*, *e.g.*, *People v. Monterroso*, 34 Cal.4th 743, 764, 22 Cal. Rptr.3d 1, 101 P.3d 956 (2004); *Commonwealth v. Nesbitt*, 452 Mass. 236, 249, 892 N.E.2d 299 (2008) ("The Confrontation Clause 'is most naturally read as a reference to the right of confrontation at common law,'" which recognized dying declarations as an exception to the right of confrontation); *State v. Jones*, 287 Kan. 559, 569, 197 P.3d 815 (2008) ("[W]e are confident that, when given the opportunity to do so, the Supreme Court would confirm that a dying declaration may be admitted into evidence, even when it is testimonial and unconfronted."); *Harkins v. State*, 122 Nev. 974, 982, 143 P.3d 706 (2006) ("[B]ecause dying declarations were recognized at common law as an exception to the right of confrontation, they should continue to be recognized as an exception.").

[*P61] The California Supreme Court, in *Monterroso*, reasoned as follows:

> Dying declarations were admissible at common law in felony cases, even when the defendant was not present at the time the statement was taken. (Peake, Evidence [3d ed. 1808] p. 64). In particular, the common law allowed "'the declaration of the deceased, after the mortal blow, as to the fact itself, and the party by whom it was committed,'" provided that "'the deceased at the time of making such declarations was conscious of his danger.'" (*King v. Reason* [K.B. 1722] 16 How. Str. Tr. 1, 24-25.) To exclude such evidence as violative of the right to confrontation "would not only be contrary to all precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to the sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught. But dying declarations, made under certain circumstances, were admissible at common law, and that common law was not repudiated by our constitution in the clause referred to, but adopted and cherished." (*State v. Houser* [Mo. 1858] 26 Mo. 431, 438; *accord*, *Mattox v. United States* (1895), 156 U.S. 237, 243-244, 39 L.Ed. 409, 15 S.Ct. 337, (from

13

> time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility".)

*Monterroso* at 764-765.

[*P62] The *Monterroso* court then concluded:

> Thus, if, as *Crawford* teaches, the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding" (*Crawford*, *supra*, 124 S.Ct. at 1365, citing *Houser*, *supra*, 26 Mo. at 433-435), it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment.

*Id*. at 765.

[*P63] More recently, the United States Supreme Court has reiterated *Crawford's* acknowledgement of authority that the Sixth Amendment incorporates an exception for testimonial dying declarations. *See Giles v. California*, 554 U.S. 353, 358-359, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) ("We have previously acknowledged that two forms of testimonial statements were admitted at the common law even though they were unconfronted[;] [t]he first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying."); *Michigan v. Bryant*, U.S. , 131 S.Ct. 1143, 1151, 179 L.Ed.2d 93 (2011), fn. 1, ("[I]n Crawford * * * we first suggested that dying declarations, even if testimonial, might be admissible as a historic exception to the Confrontation Clause.").

[*P64] In light of this case law, we hold that the Sixth Amendment incorporates an exception for "the common law pedigree" of dying declarations, even testimonial ones, and that Crawford did not alter this rule. *See Monterroso*, 34 Cal.4th at 765, 22 Cal. Rptr.3d 1, 101 P.3d 956.

[*P65] Next, we determine whether Stuckey's statements met the constitutional standard for dying declarations, notwithstanding that we have already held that his statements qualified as dying declarations under Evid.R. 804(B)(2). *See generally*, *Nicolas*, *'I'm Dying to Tell You What Happened': The Admissibility of Testimonial Dying Declarations Post-Crawford*, 37 Hastings

14

Const.L.Q. 487 (Spring 2010) (examining how to define the phrase "dying declarations" as a constitutional matter.).

[*P66] This court did not examine this issue in *Nix* or *Washington*, and Kennedy has not presented any argument that the Evid.R. 804(B)(2) exception for a dying declaration deviates from the common-law exception recognized when the United States Constitution was drafted.

[*P67] Evid.R. 102 expressly requires an Ohio court to apply the "principles of the common law of Ohio" unless the evidence rule "clearly indicates that a change is intended." Although we note that Evid.R. 804(B)(2) expands the common-law rule by allowing the exception for dying declarations in civil cases, see Staff Note to Rule 804(B)(2), the rule appears otherwise to comport with the common law definition of "dying declarations" at the time of the federal Constitution.

[*P68] In *Robbins v. State*, 8 Ohio St. 131, 163 (1857), the Ohio Supreme court recognized as settled law that in a prosecution for homicide, a deceased-declarant's statement about the cause or circumstances of his or her death passed muster as a dying declaration under Ohio's Confrontation Clause only if the court was satisfied that the statement had been "made under a sense of *impending death*, excluding from the mind of the dying person *all hope or expectation of recovery*." (Emphasis in original). *See Montgomery v. State*, 11 Ohio 424, 425 (1842) (holding that the court must determine "that the deceased not only made the declarations just before death, and while in extremis, but also that he was conscious of his true condition").

[*P69] Ohio's "confrontation clause," provides that "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face." Article I, Section 10, Ohio Constitution. This right is understood to encompass the right of confrontation as recognized by the Sixth Amendment to the United States Constitution. *See Summons*, 5 Ohio St. at 340. In *Summons*, the Ohio Supreme Court described Ohio's confrontation clause as "a constitutional guaranty of one of the great fundamental principles well established, and long recognized at common law, both in England and this country." *Id*. The court then confirmed that "the assertion of it in the fundamental law of the State, was designed neither to enlarge nor curtail it in its operation, but to give it permanency, and secure it against the power of change or innovation." *Id*.

15

[*P70] We have already held that Stuckey's statement was made under an impending sense of death, without any hope of recovery. Thus, we conclude that Stuckey's statements, offered in Kennedy's prosecution for homicide and identifying Kennedy as his assailant, qualified as dying declarations under the common law. *See Robbins*, 8 Ohio St. at 163. Therefore, we hold that the admission of these statements did not conflict with Kennedy's Sixth Amendment right to confrontation.

[*P71] Accordingly, we overrule the second assignment of error.

*State v. Kennedy*, *supra*.

In his Amended Traverse, Mr. Kennedy argues this Ground for Relief largely as a matter of Ohio evidence law. That is, he claims the First District was wrong as a matter of law when it found Mr. Stuckey's identification was admissible as a dying declaration.[1] Whether a particular statement is admissible as a dying declaration is entirely a question of state evidence law which this Court is not authorized to reconsider. *Estelle*, *supra*. Mr. Kennedy has cited no United States Supreme Court precedent holding that admission of a dying declaration when there is a factual dispute about admissibility makes a trial fundamentally unfair. There was no due process violation in admitting Mr. Stuckey's statement.

Nor was there any Confrontation Clause violation. Kennedy asserts Mr. Stuckey made the statement "while subject to structured police questioning, requiring the application of *Crawford v. Washington*, 541 U.S. 36 (2004)." The First District considered this argument, but found that because dying declarations were a well-established exception to the hearsay rule at common law, they were properly found to be an exception to *Crawford*. *State v. Kennedy*, *supra*, at ¶¶ 60-63, *citing People v. Monterroso*, 34 Cal. 4th 743, 101 P.3d 956 (2004), and language in *Crawford* itself suggesting the same result. Kennedy has made no showing that this

---

[1] He also hypothesizes that the State might argue in the alternative that Stuckey's statement was an excited utterance (ECF No. 20, PageID 1588). The State makes no such argument and the Court therefore need not address Mr. Kennedy's excited utterance analysis.

is an objectively unreasonable application of *Crawford* or later Supreme Court case law applying *Crawford*.

Mr. Kennedy's First Ground for Relief is therefore without merit and should be dismissed with prejudice.


**Ground Two:  Prejudicial Joinder**


In his Second Ground for Relief, Mr. Kennedy claims he was denied a fair trial by the trial court's refusal to separate the two incidents for trial.  This was his first assignment of error on direct appeal which the First District decided as follows:

> **A. Misjoinder and Prejudicial Joiner [sic]**
>
> **[*P21]** In his first assignment of error, Kennedy argues that the trial court erred by overruling his motion to sever.
>
> **[*P22]** Kennedy moved to sever the offenses related to the Vine-Street shootings from the offenses related to the gambling-apartment shootings. He claimed that Crim.R. 8(A) did not allow the joiner of those offenses in the same indictment, and that, if proper, the joinder would be prejudicial as contemplated by Crim.R. 14. He argued that the failure to sever would be prejudicial because the jury was likely to rely on evidence related to the offenses in one incident to infer Kennedy's guilt for the offenses related to the other incident. The state argued that joiner of the "homicides" was appropriate, and that severance was not appropriate, because Kennedy had failed to show prejudice from the joinder. The trial court overruled the motion.
>
> **[*P23]** Crim.R. 8(A) pertains to the joinder of offenses in a single indictment. This rule provides that "two or more offenses may be charged in the same indictment" if the offenses are (1) "of the same or similar character; (2) "based on the same act or transaction;" (3) "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan," or (4) "part of a course of criminal conduct." Crim.R. 8(A). Like R.C. 2941.04, Crim.R. 8 attempts to set the limits of permissible joinder.

[*P24] Where joinder is not appropriate under Crim.R. 8(A) because the offenses do not meet at least one of the four joinder requirements, the trial court should grant a motion to sever, even in the absence of prejudice. *See State v. Schaim*, 65 Ohio St.3d 51, 58, 1992 Ohio 31, 600 N.E.2d 661 (1992) (holding that "if similar offenses are properly joined pursuant to Crim.R. 8(A), a defendant can still move to sever the charges pursuant to Crim.R. 14 if their consolidation will prejudice his or her rights"); *see also State v. Atkinson*, 4 Ohio St.2d 19, 21-22, 211 N.E.2d 665 (1965) (applying R.C. 2941.04), *limited in part on other grounds, State v. Minneker*, 27 Ohio St.2d 155, 271 N.E.2d 821 (1971). The issue involves a question of law, which we review de novo. *See Schaim* at 59-63.

[*P25] Kennedy maintains that the Vine-Street offenses were misjoined under Crim.R. 8 with the gambling-apartment offenses. The state does not address the requirements of Crim.R. 8. Nonetheless, after our review of the record, we find that joinder of the offenses was permitted under Crim.R. 8(A), even though the offenses were not based on the same transaction or related transactions.

[*P26] The Ohio Supreme Court has repeatedly held that the joinder of multiple offenses against the same defendant in a single trial is encouraged. *State v. Williams*, 73 Ohio St.3d 153, 158, 1995 Ohio 275, 652 N.E.2d 721 (1995); *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). Under Crim.R. 8(A), offenses that are "of the same or similar character" may be joined. *See State v. Coleman*, 1st Dist. Hamilton No. C-900872, 1992 Ohio App. LEXIS 1046 (Mar. 11, 1992).

[*P27] The phrase "of the same or similar character" has been given a broad definition. *See Schaim*, 65 Ohio St.3d at fn. 6, 1992 Ohio 31, 600 N.E.2d 661 (rejecting defendant's request for a narrow definition in a case involving charges of forcible rape, sexual imposition, and gross sexual imposition against three different victims.)

[*P28] Kennedy claims that the incidents were not of the same or of a similar character. But both incidents resulted in charges alleging that Kennedy had purposely caused the death of another (Counts 1, 3, and 10), that he had caused the death of another while committing felonious assault (Counts 2, 4, and 11), that he had knowingly caused serious physical harm and had knowingly caused physical harm by means of a firearm (Counts 5, 6, 12, and 13), and that he had had weapons under a disability (Counts 8, 9,

14, and 15). And both sets of charges contained the same firearm specifications.

[*P29] Although the two incidents did not involve the exact same offenses—the gambling-apartment shootings also involved a robbery, which affected several of the counts—the offenses stemming from the two incidents were of a similar character, involving acts of violence committed with a firearm. Accordingly, we hold that in this case the similarities justified joinder in the first instance under Crim.R. 8(A).

[*P30] The joining of offenses because they are of a same or similar character, however, creates a greater risk of prejudice to a defendant. *Schaim*, 65 Ohio St.3d at 58, 600 N.E.2d 661. Joinder may not be appropriate, even though the offenses are of the same or similar character, "when the offenses are unrelated and the evidence as to each is very weak." *Torres*, 66 Ohio St.2d at 343, 421 N.E2d 1288. *See Schaim* at 62; *State v. Echols*, 128 Ohio App.3d 677, 696, 716 N.E.2d 728 (1st Dist.1998) (holding that the trial court erred by failing to sever counts where the evidence of the offenses failed to demonstrate a modus operandi, and where the likelihood that the jury would misuse the evidence was substantial); *State v. Garrett*, 12th Dist. Clermont No. CA2008-08-075, 2009-Ohio-5442.

[*P31] Crim.R.14 provides relief from prejudicial joinder. A defendant requesting separate trials of multiple charges must affirmatively demonstrate prejudice by providing the trial court with adequate information so that the trial court can "weigh the considerations favoring joinder against the defendant's right to a fair trial." *Torres*, 66 Ohio St.2d at syllabus, 421 N.E.2d 1288.

[*P32] The state may rebut the defendant's claim of prejudice in two ways. The state may argue that it could introduce evidence relevant to one offense in the trial of the other offense as other-acts evidence. Or the state may show that the evidence relevant to each offense joined is "simple and direct." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

[*P33] We review the trial court's determination of prejudice and its denial of separate trials under an abuse of discretion standard. *See Torres*, 66 Ohio St.2d at syllabus, 421 N.E.2d 1288.

[*P34] Kennedy claims prejudice arose from the joinder because the evidence of the multiple murders and assaults, when presented in a single trial, created an accumulation of evidence that allowed

the state to portray him as a gun-toting, violent individual, and that allowed the jury to infer his guilt for the offenses on this improper portrayal, despite the state's presentation of weak evidence.

[*P35] To negate Kennedy's claim of prejudice, the state contends that the evidence of each shooting was simple and direct, and that the jury could easily segregate the proof relevant to each. We agree. The jury could easily segregate the evidence from each incident. The facts of each were uncomplicated and distinguishable, and the state referred to the evidence in support of each shooting in that manner. And the evidence was amply sufficient to sustain the verdicts related to each incident, whether or not the counts were tried together.

[*P36] Under these circumstances, Kennedy has failed to demonstrate error in the trial court's denial of his motion to sever the gambling-apartment offenses from the Vine-Street offenses. Accordingly, we overrule the first assignment of error.

*State v. Kennedy*, *supra*.

The Warden contends that only a state law claim about joinder was presented to the First District on appeal and this Court cannot consider any possible error of that court in applying the Ohio law of joinder (Return, ECF No. 7, PageID 52-57).

Mr. Kennedy does not respond directly to this assertion. He cites his Fifth Amendment right to a fair trial and federal precedent on joinder, but argues the Ground for Relief in terms of the Ohio Rules of Criminal Procedure and Ohio case law (Amended Traverse, ECF No. 20, PageID 1589, citing as applicable federal law *United States v. Lane*, 474 U.S. 438 (1986), but also citing Ohio R. Crim. P. 8 and Ohio R. Evid. 404(B), *State v. Williams*, 73 Ohio St. 3d 153 (1995), and *State v. Echols*, 128 Ohio App. 3d 677 (1st Dist. 1998)).

To preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik*,

986 F.2d 1506, 1516 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), overruled in part on other grounds by *Thompson v. Keohane*, 516 U.S. 99 (1995); *Riggins v. McMackin*, 935 F.2d 790, 792 (6th Cir. 1991). The claim must be fairly presented at every stage of the state appellate process. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009).

"Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); accord, *Jacobs v. Mohr*, 265 F.3d 407, 415 (6th Cir. 2001); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 674, 681 (6th Cir. 2000); *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006); *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004).

A state prisoner ordinarily does not 'fairly present' a federal claim to a state court if that court must read beyond a petition, a brief, or similar papers to find material that will alert it to the presence of such a claim. *Baldwin v. Reese*, 541 U.S. 27 (2004).  When a defendant does so little to present his claim that it has not been fairly presented, then the presumption under *Harrington v. Richter* that the state court decided the claim on the merits is "fully rebutted." *Johnson v. Williams*, 568 U.S. ___, 133 S. Ct. 1088, *; 185 L. Ed. 2d 105 (2013).  On the other hand, when a federal claim is fairly presented but not addressed, "a federal habeas court must *presume* that the federal claim was adjudicated on the merits. . ."  *Ross v. Pineda*, 2013 U.S. App. LEXIS 25481 (6th Cir. 2013), *quoting Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013)(emphasis added).

When one examines Kennedy's Brief on appeal, one finds that the joinder issue was argued entirely in terms of Ohio law; there are no federal constitutional citations or arguments (Appellant's Brief, ECF No. 7-1, PageID 115, 125-26).

Because Kennedy failed to fairly present any constitutional joinder claim to the Ohio

courts, he has procedurally defaulted his Second Ground for Relief, which should therefore be dismissed with prejudice.

**Ground Three:  Other Acts Testimony**

In his Third Ground for Relief, Mr. Kennedy claims that admitting "other acts" testimony denied him a fair trial.  This claim was presented as the third assignment of error on direct appeal and decided by the First District as follows:

> **C. Other-Acts Evidence**
>
> [*P72] In his third assignment of error, Kennedy contends that the trial court's admission of other-acts testimony, in violation of Evid.R. 404(B), denied him a fair trial.
>
> [*P73] Specifically, Kennedy challenges the testimony of jail-inmate Tobias Johnson, who testified about conversations he had had with Kennedy while incarcerated with him at the justice center. After Johnson related how Kennedy had described the Matthews-Turnbow shooting, the prosecutor then asked, "[Was] there ever a time when you observed the defendant either talking to you or other people about other killings that he had been involved in?" Defense counsel objected on the grounds that the question was eliciting other-acts testimony. Anticipating Johnson's response, the prosecutor stated that the testimony would demonstrate Kennedy's intent to kill Matthews, Turnbow, and Stuckey. The trial court overruled the objection. Johnson then testified that Kennedy would get keyed up by bragging that he was a serial killer and "got bodies on his belt."
>
> [*P74] Evid.R. 404(B) precludes the admission of evidence of other crimes offered to prove the character of an accused in order to show that the accused acted in conformity with that character. But the rule does not preclude the admission of that evidence for other purposes. *See* Evid.R. 404(B); *see also* R.C. 2945.59.
>
> [*P75] In evaluating the admissibility of other-acts evidence, the trial court should first "consider whether the other act evidence is relevant to making any fact that is of consequence to the

determination of the action more or less probable than it would be without the evidence." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20, citing Evid.R. 401. Next, the court should determine if "evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other act evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id*. Finally, the court should "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id*., citing Evid.R. 403.

[**\*P76**] The admission of other-acts evidence under Evid.R. 404(B) rests within the broad discretion of the trial court. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, syllabus; *Williams* at ¶ 17. We review the trial court's decision under an abuse-of-discretion standard. *Morris, supra.*

[**\*P77**] "'Abuse of discretion' has been described as including a ruling that lacks a "'sound reasoning process.'" *Morris* at ¶ 14, citing *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Our review is a deferential one; it is not enough for this court to determine that the trial court abused its discretion simply because we may have reached a different conclusion. *Id*. Further, we should not disturb an evidentiary decision "in the absence of an abuse of discretion that created material prejudice." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.

[**\*P78**] In this case, the challenged testimony passes the first step of the three-step analysis. Kennedy was charged with purposefully causing the death of Matthews, Turnbow, and Stuckey. Thus, the state was charged with proving that Kennedy had intended to kill all three, and that the deaths were not, as Kennedy argues in the case of Matthews and Turnbow, the result of recklessness. That Kennedy bragged about being a killer tended to show that he had intended to kill them.

[**\*P79**] The testimony also passes the second step of the analysis. Contrary to Kennedy's assertion, the state used the testimony for the specific purpose of showing that Kennedy, who bragged about the killings, had intended to kill his victims. In closing argument, the prosecutor told the jury that Kennedy's objection to Johnson's anticipated testimony was overruled because the testimony was admissible to prove what Kennedy "was thinking about" when he shot his victims.

23

[**\*P80**] The final step we consider is whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice. Kennedy was charged with three counts of purposeful murder, and the state had evidence to support those charges. The fact that Kennedy bragged about being a serial killer after the three murders was probative of his intent to kill his shooting victims. There was no danger of unfair prejudice in this case because the prosecutor told the jurors the specific purpose for which they could use the evidence. Further, the defense argued that Kennedy's bragging was only "puffing," a necessary part of survival in the "murder pod."

[**\*P81**] Under these circumstances, we conclude that the trial court did not abuse its discretion by allowing the challenged other-acts testimony. Accordingly, we overrule the third assignment of error.

*State v. Kennedy*, *supra.*

Here as with the Second Ground for Relief, the State argues this claim was presented to and decided by the Ohio courts purely as a matter of Ohio evidence law and not as a federal constitutional claim (Return, ECF No. 7, PageID 57-58).  Examination of Kennedy's Brief on appeal confirms this to be the case.  In support of his third assignment of error, Kennedy cited Ohio Evid. R. 404(B), the analogous Ohio Revised Code § 2945.59, and two Ohio Supreme Court cases (Appellant's Brief, ECF No. 7-1, PageID 116).  The body of the argument consumes less than a page of text and never mentions the federal Constitution or even uses the words "fair trial."  In his Amended Traverse Kennedy argues the "serial killer" testimony was "especially prejudicial," then tacks on that it "clearly violated his Fifth and Fourteenth Amendment right to due process of law." (ECF No. 20, PageID 1591.)  No Supreme Court case law is cited and in fact the Supreme Court has never held that admission of other acts testimony violates due process.  "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003), noting that the Supreme Court refused to

reach the issue in *Estelle v. McGuire*, 502 U.S. 62 (1991).

Mr. Kennedy's Third Ground for Relief should be dismissed as procedurally defaulted because it was never fairly presented as a federal constitutional claim to the state courts and on the merits because it does not state a claim under the United States Constitution.

**Ground Four: Insufficient Evidence**

In his Fourth Ground for Relief, Petitioner asserts his convictions are not supported by sufficient evidence. This claim was raised as part of his fourth assignment of error on direct appeal, along with a claim that the conviction was against the manifest weight of the evidence. The First District decided this assignment of error as follows:

> **D. Sufficiency-and-Weight-of-the-Evidence Claims**
>
> **[\*P82]** In his fourth assignment of error, Kennedy challenges the sufficiency of the evidence to support his convictions, as well as the weight given it by the jury.
>
> **[\*P83]** The test for the sufficiency of the evidence required to sustain a conviction is whether, after viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 36, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact. *See State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, 968 N.E.2d 27, ¶ 25 (1st Dist.).
>
> **[\*P84]** When reviewing a weight-of-the-evidence question, an appellate court must review the entire record, weight the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the

evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997).

## 1. Gambling-Apartment Shootings—Counts 1, 3, 5, 7, and 8

[*P85] With respect to the gambling-apartment shootings, Kennedy was convicted of aggravated murder for purposely causing the death of Matthews, in violation of R.C. 2903.01(B), with a three-year firearm specification (Count 1), aggravated murder for purposely the death of Turnbow in violation of R.C. 2903.01(B) (Count 3), felonious assault for knowingly causing physical harm to Thomas in violation of R.C. 2903.11(A)(1) (Count 5), aggravated robbery for the theft of money facilitated by the use of a deadly weapon with respect to Dumas and the other occupants, in violation of R.C. 2911.01(A)(1) (Count 7), and having weapons under a disability in violation of R.C. 2923.13(A)(2) (Count 8). The state proceeded against Kennedy as an accomplice with respect to the felonious assault of Thomas.

[*P86] The evidence at trial met the test of sufficiency. Dumas testified that he, Matthews, Turnbow, and the others present at Matthews's apartment were robbed at gun point during a card game that Thompson had previously participated in. Beard testified that Kennedy had told him that Jaydee Thompson had turned him "onto a lick at a gambling apartment," and that he had shot the woman who had answered the door and a man named "Rodney" (Turnbow), and then took $1500 out of Rodney's pocket.

[*P87] Tobias Johnson, another witness for the state, testified that Kennedy had admitted to committing these offenses, including shooting Matthews and Turnbow, after going to Matthews's home to commit a robbery. According to Johnson, Kennedy also told him that Thompson had shot Thomas in the face on the staircase as they fled. Derrell Anderson provided testimony concerning similar admissions by Kennedy. Thomas, who knew Thompson, testified that he had recognized Thompson as his shooter.

[*P88] Finally, Kennedy stipulated to having the prior convictions that created the disability in support of the weapons offense that resulted from the gambling-apartment shootings.

[*P89] In addition to his general challenge to the sufficiency of the evidence, Kennedy specifically argues that the state failed prove that he had purposely caused the deaths of Matthews and Turnbow. We disagree.

26

[*P90] Kennedy was convicted of aggravated felony murder under R.C. 2903.01(B), which proscribes "purposely caus[ing] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery." A person acts purposely when he specifically intends to cause a certain result. *See* R.C. 2901.22(A); *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 188. Intent to kill may be proved by inference and "may be inferred in a[n] [aggravated] felony-murder when the offense and the manner of its commission would be likely to produce death." *State v. Garner*, 74 Ohio St. 3d 49, 60, 1995 Ohio 168, 656 N.E.2d 623 (1995); *see State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 28, citing *State v. McCoy*, 1st Dist. Hamilton No. C-090559, 2010-Ohio-5810, ¶ 36.

[*P91] Kennedy claims that the evidence was insufficient to demonstrate a purpose to kill Matthews because there was some evidence that she had been shot through the door as she was opening it, instead of closing it. But whether Kennedy shot Matthews when she was closing or opening the door is irrelevant. Either way, he had to know that someone was responsible for the movement of the door, and that that person was standing on the other side of it, blocking his entrance. And Kennedy's bullet, fired at fairly close range, struck Matthews squarely in her chest.

[*P92] Kennedy also suggests that Turnbow's death was not a purposeful killing, just the result of an errant bullet. But Kennedy shot Turnbow in the head, at what had to have been fairly close range in Matthews's small apartment, and there was evidence that Kennedy had shot Turnbow because he tried to run.

[*P93] Further, Johnson testified that Kennedy had bragged while incarcerated about being a killer. This evidence, along with the evidence of the manner of the shootings, when viewed in the light most favorable to the prosecution, was sufficient evidence from which the trier of fact could have reasonably concluded that Kennedy had specifically intended to cause death. *See Tibbs*, 2011-Ohio-6716 at ¶ 37.

[*P94] In sum, construing the evidence in the light most favorable to the prosecution, any rational juror could have concluded beyond a reasonable doubt that Kennedy had committed the offenses related to the gambling-apartment shootings, including the aggravated felony murders of Matthews and Turnbow, the

felonious assault of Thomas, the aggravated robbery of Dumas and the other gambling participants in Matthews's apartment, and the offense of having weapons under a disability.

### 2. Vine-Street Shootings—Counts 10, 12, and 14

[*P95] With respect the Vine-Street shootings, Kennedy was convicted of murder in violation of R.C. 2903.02(A), with a three-year firearm specification, for purposely causing the death of Stuckey (Count 10), felonious assault in violation of R.C. 2901.11(A)(1), for knowingly causing serious physical harm to Simmons (Count 12), and having weapons under a disability in violation of R.C. 2913.13(A)(2) (Count 14).

[*P96] Officer Schultz testified that had he arrived at the scene of the shooting on Vine Street shortly after hearing shots fired. He learned that a bystander, Simmons, had been shot on the street, and he found Stuckey on the floor of a Cricket Store with multiple bullet wounds. Stuckey identified his shooter first as "Midnight" and then as "Midnight from Burnet." Several witnesses at trial testified that Kennedy was known as "Midnight," and that he "hung out" on Burnet Avenue. Kennedy even acknowledged his nickname during a police interview, and he admitted that he knew Stuckey, and that Stuckey had previously robbed him.

[*P97] Robb and Paige, two inmates who had been incarcerated with Kennedy at the justice center, testified that Kennedy had admitted to shooting Stuckey and a bystander on that day.

[*P98] Kennedy specifically argues that the state failed to prove that he caused "serious physical harm," an element of the felonious-assault charge under R.C. 2903.11(A)(1) relating to Simmons. In support, Kennedy cites testimony from Officer Thompson, assigned to investigate the Vine-Street shootings, who stated that Simmons was "shot superficially with a stray bullet."

[*P99] The "serious physical harm" element of R.C. 2903.11(A)(1) is defined in R.C. 2901.01(A)(5). This definition includes "any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement." R.C. 2901.01(A)(5)(d). Although Simmons did not testify and Officer Thompson generally characterized Simmons's injury as superficial, the medical records admitted at trial by stipulation demonstrated that Simmons had sustained multiple "abrasion/puncture wounds" caused by bullet fragments, with some fragments remaining in his soft tissue. At the hospital, the wounds

were irrigated and treated with antibiotics. Simmons was prescribed vicodin for severe pain and antibiotics, upon discharge after spending the night at the hospital. This evidence, when viewed in the light most favorable to the prosecutor, was sufficient to convince a rational trier of fact beyond a reasonable doubt that Kennedy had caused "serious physical harm" to Simmons.

[*P100] Finally, Kennedy stipulated to his prior convictions that had resulted in a disability on the day of the Vine-Street shootings. The stipulation supported his conviction for having weapons under a disability on that date.

[*P101] We conclude, therefore, after construing the evidence in the light most favorable to the prosecution, that any rational juror could have concluded beyond a reasonable doubt that Kennedy had committed all of the offenses related to the Vine-Street shootings, including the murder of Stuckey, the felonious assault of Simmons, and the offense of having weapons under a disability.

### 3. Weight-of-the-Evidence Claim [Omitted – not a federal claim]

[*P103] In sum, we hold that state presented substantial, credible evidence to support the convictions. Further, we hold that there is no basis to conclude that the trier of fact lost its way or committed a manifest miscarriage of justice in resolving the factual issues against Kennedy. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

[*P104] Accordingly, we overrule the fourth assignment of error.

*State v. Kennedy*, *supra.*

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders*, 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige*, 470 F.3d 603, 608 (6ᵗʰ Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship*, *supra.* A sufficiency challenge should be assessed against the elements of the crime, not against the elements set forth in an erroneous jury instruction. *Musacchio v. United States*, 577 U.S. ___, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016).

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all

> disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008); *accord Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011)(en banc); *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012). Notably, "a court may sustain a conviction based upon nothing more than circumstantial evidence." *Stewart v. Wolfenbarger*, 595 F.3d 647, 656 (6th Cir. 2010).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Ibid. (quoting Renico v. Lett, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062 (2012)(per curiam).

In defending the Fourth Ground for Relief, the Warden asserts the First District's decision was an objectively reasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979)(Return of Writ, ECF No. 7, PageID 62-70).

In response, Mr. Kennedy claims he was convicted only "on the testimony of five

31

convicted felons, several of whom had something to gain by their testimony." Nothing in the law makes the testimony of convicted felons inherently incredible. Here the jury heard their testimony, but also impeaching evidence as to their prior convictions. Kennedy admits that only some of them had something to gain by testifying against him.

Kennedy asserts the State did not provide sufficient evidence to show that the killings were purposeful. In particular he asserts that the first victim, Ms. Matthews, was shot while opening the door rather than closing it. As the First District pointed out, that is irrelevant because Kennedy had to know someone was on the other side of that door, whether they were opening or closing it. *State v. Kennedy*, *supra*, at ¶ 91. Kennedy's claim that Turnbow was hit by an "errant" bullet was met by the First District, quite reasonably, with the observation that Turnbow was shot in the head at close range. *Id.* at ¶ 92.

Kennedy claims the State failed to prove he caused serious physical harm to Mr. Simmons, the victim in Kennedy's felonious assault conviction, because the investigating officer "did not establish serious physical harm as that term is defined in" Ohio Revised Code § 2901.01(A)(5)(Amended Traverse, ECF No. 20, PageID 1593). Kennedy provides no transcript reference for the supposedly deficient testimony. In contrast, the First District described in detail the testimony about Simmons' injuries and held those were sufficient to meet the statutory definition of serious physical harm. Of course, whether or not certain facts come within an element of state law is a question for the state courts to decide.

Given the double deference state court findings on sufficiency are entitled to, Kennedy has not shown there was insufficient evidence on which to convict him. His Fourth Ground for Relief should be dismissed with prejudice.

**Conclusion**


Based on the foregoing analysis, it is respectfully recommended that the Petition be DISMISSED WITH PREJUDICE.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.


December 29, 2016.

s/ *Michael R. Merz*
United States Magistrate Judge


**NOTICE REGARDING OBJECTIONS**


Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. .Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).